# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| Peter Denniston and Jon Lodestein, individually and as representatives of a class of similarly situated persons,<br><br>             Plaintiffs,<br><br>-v-<br><br>CenturyLink, Inc., a Louisiana corporation; CenturyLink Communications, LLC, a Delaware limited liability company; CenturyLink Public Communications, Inc., a Florida corporation ; CenturyLink Sales Solutions, Inc., a Delaware corporation; and Qwest Corporation, a Colorado corporation.<br><br>             Defendants. | Case No._____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Peter Denniston and Jon Lodestein (collectively, "Plaintiffs"), individually and as the representatives of a class of similarly situated persons, through the undersigned counsel, allege as follows:

## NATURE OF THE ACTION

1.    This is a class action against Defendants CenturyLink, Inc., CenturyLink Communications, LLC, CenturyLink Public Communications, Inc., CenturyLink Sales Solutions, Inc., and Qwest Corporation (hereinafter collectively referred to as "Defendants" or "CenturyLink") based on their unlawful activity, described below.

2.    CenturyLink engaged in misleading and deceptive conduct by adding unauthorized charges to customer's internet or telephone accounts in the state of Iowa. As outlined further below, Defendants' conduct violated applicable consumer protection statutes, breached customer contracts, and resulted in Defendants being unjustly enriched at the expense

of their customers. The relief sought, including an accounting by Defendants of their billing practices and the payment of refunds for all overcharges, is necessary and appropriate.

## PARTIES

3.      Plaintiff Peter Denniston ("Denniston") is a citizen of the State of Iowa who resides in Anamosa, Iowa.

4.      Plaintiff Jon Lodestein ("Lodestein") is a citizen of the State of Iowa who resides in Davenport, Iowa.

5.      Plaintiffs are qualified and appropriate representatives of a group of customers of Defendants who are similarly situated and have suffered harm in the same manner as Plaintiffs as a result of the actions and/or omissions of the Defendants described within (hereinafter "Class members").

6.      CenturyLink, Inc. is a Louisiana corporation doing business in the state of Iowa. Upon information and belief, CenturyLink Communications, LLC, CenturyLink Public Communications, Inc., CenturyLink Sales Solutions, Inc., and Qwest Corporation are direct and/or indirect subsidiaries of CenturyLink, Inc. and are all directly or indirectly controlled by CenturyLink, Inc. All profits of CenturyLink Communications, LLC, CenturyLink Public Communications, Inc., CenturyLink Sales Solutions, Inc., and Qwest Corporation including those obtained from the practices complained of herein, are eventually up-streamed to CenturyLink, Inc., and reported on its financial statements.

7.      As stated on CenturyLink's website, "CenturyLink (NYSE: CTL) is a global communications and IT services company focused on connecting its customers to the power of the digital world. CenturyLink offers network and data systems management, big data analytics, managed security services, hosting, cloud, and IT consulting services. The company provides

broadband, voice, video, advanced data and managed network services over a robust 265,000-route-mile U.S. fiber network and a 360,000-route-mile international transport network."

Available at: http://ir.centurylink.com/CorporateProfile.aspx?iid=4057179.

8.     CenturyLink, Inc. describes its business operations as follows in its 10-K submitted to the Securities and Exchange Commission for its 2016 operations:

> Based on our approximately 11.1 million total access lines at December 31, 2016, we believe we are the third largest wireline telecommunications company in the United States. We operate 74% of our total access lines in portions of Colorado, Arizona, Washington, Minnesota, Florida, North Carolina, Oregon, Iowa, Utah, New Mexico, Missouri, and Idaho. We also provide local service in portions of Nevada, Wisconsin, Ohio, Virginia, Texas, Nebraska, Pennsylvania, Alabama, Montana, Indiana, Arkansas, Wyoming, Tennessee, New Jersey, South Dakota, North Dakota, Kansas, South Carolina, Louisiana, Michigan, Illinois, Georgia, Mississippi, Oklahoma, and California. In the portion of these 37 states where we have access lines, which we refer to as our local service area, we are the incumbent local telephone company.
>
> At December 31, 2016, we served approximately 5.9 million broadband subscribers and 325 thousand Prism TV subscribers. We also operate 58 data centers throughout North America, Europe and Asia.

Available at: http://ir.centurylink.com/sec-filings.

9.     At all material times, Defendants have maintained legal authority to transact business in Iowa, and have maintained operations throughout the State of Iowa.

10.     As a result of the challenged practices, including advertising rates and confirming those rates in communications with Class Members that were much less than those actually charged, Defendants generated substantial sales of their services and merchandise within Iowa during the relevant Class Period, resulting in the unlawful collection of significant fee revenue from Plaintiffs and the members of the Class.

11.    Upon information and belief, each of the Defendants was the agent of each of the remaining Defendants, and was at all times herein mentioned acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of and for such agency.

12.    Upon information and belief, CenturyLink, at all relevant times, completely dominated and controlled the other Co-Defendants.  Whenever and wherever reference is made in this Complaint to any conduct by Defendant or Defendants, such allegations and references shall also be deemed to mean the conduct of each of the Defendants, acting individually, jointly, and severally. Whenever and wherever reference is made to individuals who are not named as Defendants in this Complaint, but were employees and/or agents of Defendants, such individuals at all relevant times acted on behalf of the Defendants named in this Complaint within the scope of their respective employment.

## JURISDICTION AND VENUE

13.    This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) the amount in controversy, exclusive of interest and costs, exceeds $5,000,000.00 in the aggregate; and (2) members of the proposed Class are citizens of a State different from Defendants.

14.    This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in the State of Iowa.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs and Class Members' claims occurred in the Southern District of Iowa as Defendants: (a) are authorized to conduct business in this District and have intentionally availed themselves to the laws within this District; (b) currently conduct substantial

business in this District, including operating an office in Davenport, Iowa; and (c) are subject to personal jurisdiction in this District.

## FACTS

16.    On June 14, 2017, former CenturyLink employee Heidi Heiser filed a whistleblower complaint in the Superior Court of Arizona for Maricopa County alleging that she was terminated for reporting to her supervisors and the CEO unlawful billing practices she observed and refused to take part in as a sales representative. *Heiser v. CenturyLink, Inc.,* No. 17-cv-02333-DGC (District of Arizona).

17.    As explained in the *Heiser* complaint, Defendants maintain incentive programs for their employees and agents that provide financial incentives to charge customers for services they do not order, or to overcharge customers for services they did order.  For example, Ms. Heiser alleges that "multiple CenturyLink customers were being designated as having additional accounts that they informed Ms. Heiser they did not request or approve."  Heiser Complaint ¶ 13. According to Ms. Heiser, CenturyLink allowed persons to add services or lines, which were not approved by the customers, "which would then inure to the direct or indirect benefit of such CenturyLink agents or their supervisors," as well as CenturyLink.  *Id.* ¶ 15.

18.    Rather than uphold their duty to act in good faith and to ensure that they accurately charge consumers, and for services that consumers authorized, Defendants have shifted that burden to consumers and essentially dared them to locate the overcharges and then demand refunds.  As explained in the *Heiser* complaint, when customers complained about the addition of unauthorized lines or services, "CenturyLink's policy was generally to inform the complaining customer that CenturyLink's system indicated the customer had approved the

service . . . and to therefore demand payment for any such extra services through the date of the complaint, and to only rectify the problem on a going-forward basis." *Id.* ¶ 19.

19.    According to Ms. Heiser, CenturyLink managers were well aware of these issues because "the customers' complaints related to unauthorized services and charges were so prolific." *Id.* ¶ 20.  In fact, it became clear to Ms. Heiser that CenturyLink management had not only created incentives that encouraged CenturyLink agents to add unauthorized lines and services to customer accounts, these same managers "were knowingly and intentionally ignoring the customer complaints about such practices and enforcing policies that allowed CenturyLink to keep payments received on unauthorized charges and to encourage more such payments." *Id.* ¶ 22.

20.    Ms. Heiser's allegations of what she observed, and what the CenturyLink corporate culture encouraged, are consistent with the experiences of thousands of consumers who have been misled by CenturyLink.

21.    Many current and previous CenturyLink customers, including Iowa consumers, have posted messages on social media and consumer watchdog websites, describing the type of deceptive and unlawful conduct described in the Heiser complaint.  By way of example, the following consumer complaint is emblematic of CenturyLink's practices:

 jared of Humboldt, IA on
July 11, 2017

Satisfaction Rating



This is the most corrupt company I have ever dealt with. I was constantly having problems with them overcharging me. Anyway I had a account with them for 3 years. I was first overcharged to $58 from my normal $30 normal bill amount that they take direct out of my bank account. So I called. They said I was overcharged from promotion expired. Anyway they set me up with a new promotion and said it would be $25.05 a month. I still have a confirmation paper they sent out showing my next bill should have charged that amount. But instead they charged me $58 again saying it had already been billed for $58 and they couldn't change it. So I told them I want full refund for the overcharges and when they offered only $20 I decided to switch internet companies. Now I got switch but they are trying to charge me another $300 in late fees and charges for early disconnect of contract.

Available at https://www.consumeraffairs.com/cell_phones/centurylink.html. This site contains many similar complaints regarding CenturyLink's billing practices, which collectively demonstrate a pattern and practice of Defendants' violations of applicable consumer protection statutes, breach of customer contracts, and unjust enrichment at the expense of its customers.

22.    Specifically, Defendants asserted that customers were responsible for alerting CenturyLink to any overbilling, and that they were required to report any billing disputes within three months. Upon information and belief, CenturyLink would not immediately honor a request for a refund of any overpayment if it was not within the past three months.

7

23.     Many customers grew so frustrated with CenturyLink that they terminated CenturyLink's services, only to be threatened with or face an "early termination fee" that was required to be prorated, but the terms of the proration, according to CenturyLink, were left to CenturyLink's sole discretion.

24.     Additionally, CenturyLink obscured and misrepresented fees that would be charged, assessing an "Internet Cost Recovery Fee" or a "Broadband Recovery Fee" on customer billing records to make it appear like a government-mandated tax or other regulated fee, when in fact it was not. Rather, it was part of CenturyLink's monthly recurring internet service fees, deceptively separated out from any promotional rate to make promotional base rates appear lower to customers.

25.     Further, searching Twitter and Facebook with the word "CenturyLink" and any number of additional keywords—"scam," "fraud," "ripoff," and "bill"—provides significant levels of discord, desperation, and demands from victims to remedy CenturyLink's unlawful practices. A Google search of "CenturyLink Complaints," provides similar results.

26.     Upon information and belief, at least one State's Attorney General has investigated and entered into an "assurance of discontinuance" with CenturyLink which prohibits the conduct described herein, including billing consumers at higher rates than represented. *See Approval of Assurance of Discontinuance, In the Matter of Qwest Corp. d/b/a CenturyLink QC*, No. CV 2016-002842 (Superior Court, Maricopa County, Arizona – filed April 13, 2016). Regardless, CenturyLink's unlawful conduct remains ongoing.  Other states' Attorneys General have commenced actions or investigations into Defendants' Practices, including one by the Minnesota State Attorney General. *State by Swanson v. CenturyTelBroadband Svcs. LLC, et al.*,

No. 02-CV-17-3488, Complaint (District Court, Anoka County, Minnesota – filed July 12, 2017).

27.    The Better Business Bureau ("BBB") has also identified a pattern of consumer complaints regarding CenturyLink's deceptive billing practices.  According to the BBB Website:

> CenturyLink consumers are alleging sales practice issues with this business.  They state they are often charged more than the price they agreed to when signing up for the service, and that they do not receive the speed and quality that is promised by sales representatives.   BBB has also received several complaints regarding customer service issues, specifically that the business is not responsive to their questions or concerns, or will offer to reduce rates but the customers tell BBB the reduction does not go into effect on their bills.
>
> One consumer explained that they have contacted CenturyLink 47 times since signing up in order to have the overcharge fixed, but the bill has not reflected an adjustment.

Available    at    https://www.bbb.org/denver/news-events/news-releases/2017/01/bbb-warning-centurylink/.

28.    The foregoing demonstrates that Defendants have made far more than the odd mistake or rare miscommunication. On the contrary, it demonstrates that Defendants acted at the expense of unsuspecting consumers who had placed their trust in Defendants to bill them accurately, honestly, and only withdraw from their bank accounts (many of which were set up for electronic autopay deductions) the amounts actually due and agreed to.  Despite their duty to bill consumers for amounts actually authorized and agreed to, Defendants attempt to shift the burden to the consumers to locate overcharges and then demand refunds within a short time frame.

29.    The amounts billed to each consumer each month are relatively small (less than $200) and therefore, Defendants know that certain consumers will have little time to actively

monitor and immediately seek corrections when appropriate. Defendants attempt to take advantage and exploit this. This type of catch-us-if-you-can policy is unfair, deceptive and misleading.

30.     The types of practices described above have affected and continue to affect Plaintiffs and members of the Class of other CenturyLink subscribers in Iowa.

**A. Peter Denniston**

31.     Plaintiff Denniston is an individual living in Anamosa, Iowa.

32.     Mr. Denniston is a physically disabled individual and is dependent on the internet for managing his finances, connecting socially with his friends, family and relatives, for entertainment, for his medical needs, and to feel connected to the outside world.

33.     In 2015, Mr. Denniston placed an order online with CenturyLink to setup internet service. When setting up his account, Mr. Denniston was promised rates and discounts that he later learned to be false and deceptive.

34.     CenturyLink's website requested Mr. Denniston to make payments through its automated payment feature, which it represented to be a requirement to get a discounted rate.

35.     After several months, Mr. Denniston noticed that CenturyLink was taking approximately $40 dollars more from his account than the promotional rate that CenturyLink had promised. Mr. Denniston called CenturyLink about this problem and spent significant time on the phone with multiple customer representatives. Mr. Denniston then found himself caught in a web of misdirection, deceptive statements, and pass-offs from one call operator to the next, who continued to offer rates and deals that were false, leading to one agent accusing and blaming another for the incorrect rate. When Mr. Denniston explained he only wanted to correct his bill, he was treated rudely and transferred to another customer service representative. Finally,

CenturyLink refunded some of Mr. Denniston's money, but refused to return all of the money represented by the overcharges.

36.    Mr. Denniston consequentially canceled his service for internet, but continued receiving bills for four months after cancelling his service.

37.    In 2016, Mr. Denniston decided to give CenturyLink another chance and again signed up for internet service under a promotional rate.  Again, CenturyLink overcharged him by approximately $40 more than the promotional rate.

38.    Now that he was savvy to CenturyLink's billing practices, Mr. Denniston made sure to check his very first bill, at which point he noticed the overcharge.

39.    Mr. Denniston again called CenturyLink to correct the overcharges, spending more time on the phone with CenturyLink call centers disputing these charges. Instead of assisting Mr. Denniston in reversing these false and unauthorized chargers, the representatives working at Defendants' call centers would pitch Mr. Denniston on new or additional services and discounts.  After speaking to numerous customer service representatives, CenturyLink returned a small portion of the overcharges.  CenturyLink promised that this issue would be resolved on bills going forward.

40.    When Mr. Denniston checked his next bill, he noticed that the bill reflected an overcharge of approximately $30.   Disgusted with CenturyLink's billing practices, Mr. Denniston called CenturyLink to cancel his service, at which point CenturyLink threatened Mr. Denniston with an early contract termination fee of approximately $200 if Mr. Denniston canceled his service.  Mr. Denniston canceled his service, regardless.

41.    In 2017, Mr. Denniston moved to Anamosa, Iowa.   When he investigated potential internet service providers, Mr. Denniston was frustrated to discover that CenturyLink

was one of the only providers of broadband service in that area.  While Mr. Denniston was not thrilled to repeat his experiences with CenturyLink, his disabled status renders it difficult for him to leave the house and internet is one of the few means he has of connecting with the outside world.  Thus, he felt he had no choice but to sign up for CenturyLink.

42.    Mr. Denniston again signed up for an internet promotional rate with CenturyLink, and began immediately checking his bills.  When Mr. Denniston received his first bill after establishing his service with CenturyLink for the third time, the first bill was again approximately $40 more than the promised promotional rate.  The bill also included an "internet cost recovery fee" of $3.99.  The bill contained no description that explains this fee and, further, this fee was not disclosed to Mr. Denniston when he re-established service with CenturyLink.

43.    Mr. Denniston again called to correct this overcharge.  While CenturyLink applied the promotional rate on Mr. Denniston's bills going forward, CenturyLink continued to charge Mr. Denniston the "internet cost recovery fee."

44.    CenturyLink has refused to reimburse Mr. Denniston for all monies he paid above the quoted prices by CenturyLink for his internet service.

45.    When Mr. Denniston requested bills related to his prior periods of service, CenturyLink informed Mr. Denniston it would cost $5 per bill to obtain copies past a certain period.

46.    By reason of the foregoing, Mr. Denniston has been charged at least $200 by CenturyLink in unauthorized charges.  Mr. Denniston has been damaged and incurred financial loss as a result of CenturyLink's unlawful and deceptive practices.

**B. Jon Lodestein**

47.    Plaintiff Lodestein is an individual living in Davenport, Iowa.

12

48.     In February 2017, Mr. Lodestein established service with CenturyLink.  When he spoke to a CenturyLink sales representative, the representative informed Mr. Lodestein that he would pay $64.95 for internet and telephone services for three years.

49.     When Mr. Lodestein received his first bill, he noticed that he was charged approximately $30 more than the price that he was promised.

50.     Mr. Lodestein's bills also included an "internet cost recovery fee" and additional fees not disclosed by CenturyLink's representatives.

51.     Mr. Lodestein called CenturyLink to complain about the incorrect price reflected on his bills and spent a significant amount of time on the phone trying to resolve the issue. During this telephone call, CenturyLink routed Mr. Lodestein to multiple customer service representatives who each tried to convince him to buy more services from CenturyLink.  These customer representatives also informed Mr. Lodestein that the rate reflected on his bill was accurate and that he must be mistaken.  One customer service representative informed Mr. Lodestein that the $30 in additional charges was required by law, even though his bills reflected less than $10 in taxes and related government charges.  CenturyLink refused to correct the overcharging at this time.

52.     Mr. Lodestein called to complain again when he received the next bill, which also showed that CenturyLink overcharged him approximately $30 more than the promised rate. Again, he spent significant time on the phone with multiple customer service representatives. Again, he was told that his rate was correct and that he was mistaken.

53.     Mr. Lodestein continued calling CenturyLink to complain about the overcharging each time that he received a new monthly bill.

54.    During one of these calls, a CenturyLink representative finally admitted that CenturyLink had overcharged Mr. Lodestein.  CenturyLink told him, however, that it was impossible to refund him the money that he overpaid.

55.    Further, CenturyLink offered in promotion a $100 gift card. Mr. Lodestein never received the $100 gift card.  After Mr. Lodestein called repeatedly to inquire about the gift card, a CenturyLink representative informed Mr. Lodestein that he would receive a credit on future bills as opposed to a gift card. CenturyLink never changed his rates to reflect the promised promotional rate, however.

56.    CenturyLink has refused to reimburse Mr. Lodestein for all monies he paid above the quoted prices by CenturyLink for his internet and telephone service.

57.    By reason of the foregoing, Mr. Lodestein has been charged at least $200 by CenturyLink in unauthorized charges.  Mr. Lodestein has been damaged and incurred financial loss as a result of CenturyLink's unlawful and deceptive practices.

## CLASS ACTION ALLEGATIONS

58.    This action is brought, and may properly be maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

59.    The Class is defined to include: "Any person or public or private entity, who contracted with Defendants for telephone, television, or internet service in the state of Iowa during the relevant Class Period" (referred to herein as the "Class").  The "Class Period" for the Class dates back to the length of the longest applicable statute of limitations for any claims asserted on behalf of that Class from the date this action was commenced and continues through the present and the date of judgment.

14

60.    Excluded from the Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiffs and their employees; and the judge and court staff to whom this case is assigned.  Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

61.    This action satisfies the predominance, commonality, typicality, numerosity, superiority, adequacy, and all other requirements of Rule 23 of the Federal Rules of Civil Procedure.

**(a) Numerosity:** The Plaintiff Class is so numerous that the individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe, and based thereon allege, that thousands of consumers have been victimized by CenturyLink's practices in Iowa, in the manner described above.

**(b) Commonality:** Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. The common questions of law and fact include, but are not limited to:

(i)    Whether Defendants engaged in a practice or act that Defendants knew or reasonably should have known is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection

15

with the advertisement, sale, or lease of equipment and telephone and internet services;

(ii)     Whether Defendants intended to cause confusion or misunderstanding among consumers regarding the prices of telecommunications services and whether Defendants intended not to honor its quoted prices;

(iii)    Whether Defendants maintained contracts with hidden or undisclosed terms requiring consumers to discover overcharges within a certain amount of time, without regard to whether such charges were permissible or allowed by law;

(iv)     Whether Defendants made misrepresentations or omissions of material fact about their quoted monthly prices and the nature of their telecommunications services and billings;

(v)     Whether Defendants breached implied or explicit contractual obligations to subscribers or deceptively billed for services not being offered, not contemplated, or not agreed upon;

(vi)     Whether Defendants breached the implied covenant of good faith and fair dealing made part of all contracts;

(vii)    Whether Defendants should be required to conduct an equitable accounting and provide refunds; and

(viii)   Whether Defendants have been unjustly enriched.

**(c) Typicality:** Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the members of the Class sustained damages arising out of Defendants' wrongful and deceptive conduct as alleged herein.

**(d) Adequacy:** Plaintiffs and the undersigned counsel will fairly and adequately protect the interests of the Class Members.  Plaintiffs have no interest that is adverse to the interests of the other Class Members and have hired counsel experienced in class actions and complex litigation.

**(e) Superiority:** A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the Class is impractical, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to and burden on the court system of adjudication of individualized litigation would be substantial, and significantly more than the costs and burdens of a class action. Class litigation will also prevent the potential for inconsistent or contradictory judgments.

**(f) Public Policy Considerations:** When a company or individual engages in deceptive and predatory conduct with a large number of consumers, it is often difficult or impossible for the vast majority of those consumers to bring individual actions against the offending party. Many consumers are either unaware that redress is available, or unable to obtain counsel to obtain that redress for financial or other reasons. Class actions provide the class members who are not named in the complaint with a vehicle to achieve vindication of their rights. The members of the Class are so numerous that the joinder of

all members would be impractical and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the court. There is a well-defined community of interest in the questions of law or fact affecting the Class Members in that the legal questions of consumer fraud, breach of contract, and other causes of action, are common to the Class Members. The factual questions relating to CenturyLink's wrongful conduct and their ill-gotten gains are also common to the Class Members.

**(g) Risk of Continuing Harm:** The practices complained of are of an ongoing and continuing nature. Most Class Members remain unaware of the practices complained of. The risk of continuing and future harm from the practices complained of continues to exist making injunctive, declaratory, and equitable relief appropriate and necessary.  For example, even in instances where CenturyLink has corrected bills, CenturyLink still includes additional charges such as a "broadband recovery fee" or "internet recovery fee," without clearly disclosing this fee to consumers and without providing any explanation as to the purpose of this charge.  Absent such relief, the amounts Defendants will improperly collect in the future will exceed that already collected. Injunctive and declaratory relief barring Defendants' continuation of these practices is thus appropriate and necessary.

**COUNT I**
**IOWA CONSUMER FRAUD ACT**
**Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.1, *et seq*.**
**(By Plaintiffs Individually and On Behalf of All**
**Class Members Against All Defendants)**

62.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

63.     Plaintiffs bring this action on behalf of themselves and on behalf of the Class against Defendants for violations of Iowa's Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.1 *et seq.* ("CFA").

64.     Plaintiffs, Class Members, and CenturyLink are all "person[s]" for purposes of the CFA.  Iowa Code § 714H.2(6).

65.     The internet, television or telephone services that CenturyLink sold to Plaintiffs and the Class meet the definition of "consumer merchandise" for purposes of the CFA.  Iowa Code § 714H.2(4).

66.     The CFA defines "deception" to mean "an act or practice that is likely to mislead a substantial number of consumers as to a material fact or facts."  Iowa Code § 714H.2(5).

67.     Pursuant to the CFA, it is unlawful for CenturyLink to engage in a practice or act that the person should know is "an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."  Iowa Code § 714H.3.

68.     As alleged herein above, Defendants, through employees and agents, have engaged in a pattern and practice of deceptive and misleading activity, and collection of monies by way of false pretenses. Defendants engaged in deceptive, unconscionable, or unfair business practices by, among other things, causing the members of the Class to be signed up for services they did not request or authorize, billing at higher rates than those quoted, billing for early termination fees, continuing to bill Class Members after they had canceled their accounts, and adding charges and requiring consumers to pay for previously undisclosed fees in connection

with signing up for Defendants' services. The amounts charged, collected and auto-deducted from bank accounts (or otherwise billed and collected) are material to Class Members. Deceptively overcharging Class Members in a manner they are unlikely to detect is a material misrepresentation or an omission of material fact to Members of the Class. As explained in the *Heiser* complaint, the foregoing occurred because Defendants maintained an incentive program for their employees and agents which provided financial incentives to them to engage in such conduct.

69.    Defendants acted with the intent that Plaintiffs and members of the Class rely on Defendants' concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise and therefore engaged in unlawful practices in violation of the CFA.  The amounts billed to each Class Member each month are relatively small ($200 or less) and therefore, Defendants know that certain Class Members will have little time to actively monitor and immediately seek corrections when appropriate. Defendants seek to exploit and take advantage of that.

70.    Plaintiffs and the Class lost money and were injured and harmed by Defendants' deceptive, unconscionable, or unfair business practices, in amounts to be determined at trial.

71.    The conduct described herein is continuing. The conduct was done for profit as a deliberate corporate policy rather than as an isolated incident, was morally wrong, callous, oppressive, willful and wanton, and done with malice or reckless disregard of the rights of Plaintiffs.

72.    As a result of the foregoing, Plaintiffs demand judgment against Defendant in an amount that will fully and fairly compensate them for their damages alleged herein, statutory

damages up to three times the amount of actual damages, attorney fees, courts costs, interest as allowed by law, and for such other relief as the Court finds may be just and proper.

73.    Pursuant to Iowa Code §§ 714H.6 and 714H.7, Plaintiffs sought and received approval from the Iowa Attorney General to file this class action and a copy of this Complaint will be mailed to the Iowa Attorney General within seven days of filing.

**COUNT II**
**BREACH OF CONTRACT**
**(By Plaintiffs Individually and On Behalf of**
**All Class Members Against All Defendants)**

74.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

75.    Plaintiffs and each member of the Class entered into contracts with Defendant for the provision of various telecommunications services at certain costs.  Plaintiffs and Class Members performed under the contracts.

76.    As explained above, Defendants maintained an incentive program(s) for their employees and agents that provided financial incentives to them to charge Class Members for services Class Members did not order or to overcharge those Class Members for services they did order.

77.    Defendants overcharged Plaintiffs and members of the Class in breach of their contracts.

78.    Plaintiffs and Class Members were charged for services which they did not purchaser, or for services they purchased but were charged excessive amounts which they did not agree to pay.

79.    Plaintiffs and the Class were injured, harmed, and incurred financial loss by way of Defendants' conduct in amounts to be determined at trial.

80.     As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT III
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (By Plaintiffs Individually and On Behalf of
### All Class Members Against All Defendants)

81.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

82.     Iowa law implies a duty of good faith and fair dealing in every contract.

83.     By the actions herein, Defendants breached that duty and did not act fairly or in good faith.

84.     Plaintiffs and the Class were injured, harmed, and incurred financial loss by way of Defendants' conduct in amounts to be determined at trial.

85.     As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT IV
## ACCOUNTING
### (By Plaintiffs Individually and On Behalf of
### All Class Members Against All Defendants)

86.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

87.     As explained above, Defendants maintained an incentive program(s) for their employees and agents that provided financial incentives to such employees and agents to charge Class Members for services that they did not order and/or to overcharge Class Members for services they did order.

88.     As a result, Defendants maintained a system of overcharging and collecting from Plaintiffs and the other members of the Class monies which they did not agree to pay.

89.     As a result of the foregoing, Defendants have received money, a portion of which is due to Plaintiffs and the Class.

90.     The amount of money due from Defendants to Plaintiffs and the Class is currently unknown to Plaintiffs and cannot be ascertained without an accounting of the receipts and disbursements of the Class' transactions and accounts with Defendants.  Plaintiffs, on behalf of the Class, therefore demand an accounting of the aforementioned transactions from Defendants and payment of the amount found due, which Defendants have failed and refused, and continue to fail and refuse, to pay such sum.  Such accounting should be conducted at Defendants' sole cost and expense.

91.     Defendants maintained sole custody and control of their accounting and billing systems. Defendants also had exclusive access to the internal incentive programs offered to their agents and employees. Many Class Members agreed to have Defendants auto-deduct payments from their bank accounts, placing trust in Defendants to only bill them amounts that Class Members agreed to pay and in good faith. By way of the foregoing, Defendants have had a special relationship with Plaintiffs and the Class and had a duty to account accurately for the amounts charged and collected for services performed and provided.

92.     Defendants failed to bill and collect sums from Plaintiffs and the Class as required by their agreements with Plaintiffs and Class Members.  Plaintiffs and the Class Members trusted and relied on Defendants to bill them accurately and only collect amounts properly due.  Many Class Members unsuspectingly provided Defendants authorization for automatic payments and

withdrawals. There is a widespread problem with overbilling and inaccurate collections by Defendants which requires review and oversight.

93.     An accounting and audit is necessary. A balance due from the Defendants to Plaintiffs and the Class can only be ascertained through such an accounting.

94.     Given their superior knowledge and access to records, as well as their duty to only bill and collect monies in good faith, Defendants are in the superior and exclusive position to confirm the accuracy of their accounts and collections from Class Members and provide refunds.

95.     Defendants should be ordered to provide an accounting of each Class Member's account, to ensure that each Class Member has not been overcharged. To the extent they have been overcharged (as with Plaintiffs), Defendants should be ordered to immediately refund the difference with interest, along with all other relief found just and equitable in the premises, including but not limited to reasonable attorneys' fees and costs.

**COUNT V**
**UNJUST ENRICHMENT**
**(By Plaintiffs Individually and On Behalf of**
**All Class Members Against All Defendants)**

96.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

97.     As a result of Defendants' unlawful and deceptive practices described above, Defendants have been unjustly enriched in retaining revenues derived from Plaintiffs and Class Members' payments for Defendants' services.   Retention of that revenue under these circumstances is unjust and inequitable because Defendants used illegal, deceptive, and unfair business practices to induce or force customers to open accounts, or purchase, or maintain services and products.

98.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and members of the Class for their unjust enrichment, along with all other relief found just and equitable, including reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class Members, pray for judgment as follows:

## CLASS CERTIFICATION

1.    For an order certifying the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    That Plaintiffs be appointed as the representatives of the Class; and

3.    That the undersigned counsel for Plaintiffs be appointed as Class Counsel.

## AS TO ALL CAUSES OF ACTION

1.    For an order finding in favor of Plaintiffs and the Class Members on all counts asserted herein;

2.    For an order declaring that Defendants' conduct violates the CFA;

3.    For treble damages as permitted under § 714H.4 for Defendants' conduct, which was willful and wanton, and done with malice or in reckless disregard of the rights of Plaintiffs;

4.    For an order enjoining Defendants from continuing their unlawful, deceptive marketing and billing practices as described herein;

5.    For all actual, consequential, statutory, and incidental losses and damages, according to proof;

6.    For an accounting;

7.      For reasonable attorneys' fees and costs, where permitted by law;

8.      For prejudgment interest on all amounts awarded;

9.      For costs of suit herein incurred; and

10.     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demands a trial by jury.

Respectfully Submitted,

Dated: August 16, 2017                **ROXANNE CONLIN & ASSOCIATES, PC**

By: /s/ Roxanne Conlin_____
Roxanne Barton Conlin, Bar No. AT0001642
3721 SW 61st St Suite C
Des Moines, IA 50321
Telephone:  (515) 283-1111
Facsimile:  (515) 282-0477
Roxlaw@aol.com

-and-

OF COUNSEL

**HELLMUTH & JOHNSON, PLLC**

Richard M. Hagstrom, MN ID # 039445
Anne T. Regan, MN ID #333852
Nicholas S. Kuhlmann, MN ID # 33750X
Jason Raether, MN ID # 394857
8050 West 78th Street
Edina, MN  55439
Telephone:  (952) 941-4005
Facsimile:  (952) 941-2337
rhagstrom@hjlawfirm.com
aregan@hjlawfirm.com
nkuhlmann@hjlawfirm.com
jraether@hjlawfirm.com